**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| TEMPEST PUBLISHING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-736 |
| | § | |
| HACIENDA RECORDS AND RECORDING | § | |
| STUDIO, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**AMENDED**
**MEMORANDUM AND OPINION**

Tempest Publishing, Inc. sued Hacienda Records and Recording Studio, Inc., Hacienda Records, L.P., and Latin American Entertainment, LLC (together, "Hacienda"), alleging infringement of the copyrights to four songs and seeking damages and attorney's fees under the federal Copyright Act, 17 U.S.C. § 101 *et seq*. After extensive discovery, Tempest moved for summary judgment, and Hacienda moved for partial summary judgment. On October 4, 2013, the court granted Hacienda's motion for partial summary judgment on Tempest's claims relating to the songs *Buscando Un Cariño* and *Morenita de Ojos Negros*. (Docket Entry No. 104.) On October 8, 2013, Tempest moved for rehearing. Tempest asked the court to change its ruling based on two documents that it asserted cured the legal deficiency Hacienda had identified in its motion for partial summary judgment and on which the court based its ruling. Those documents were drafted and signed after the court's ruling granting Hacienda's motion for partial summary judgment.

This Memorandum and Opinion addresses Tempest's motion for rehearing. Because Tempest's motion seeks rehearing of a bench ruling, and because the motion cites no legal

authority, the Memorandum and Opinion sets out in detail the reasons for granting the motion for partial summary judgment as well as for denying rehearing.[1]

## I.      Background

The relevant facts in the summary-judgment record are largely undisputed.  The record includes the deposition testimony of Roman Martinez, Sr., the songwriter's agreements that Martinez entered into with Musica Adelena, the registrations related to those songs filed with the United States Copyright Office, the Ownership Transfer Agreement between Musica Adelena and Tempest, the recording invoices and agreements that Martinez and his band entered into with Hacienda in the early 1980s, and the various invoices from Hacienda showing that Martinez or his band purchased certain recordings.

In 1966, Roman Martinez, Sr. started the band "El Grupo Internacional de Ricky and Joe" with three of his children, Ricky, Joe, and Bobby.  (Docket Entry No. 89-1, Martinez Depo., at 53.)[2] That same year, Martinez decided that "El Grupo" would record an 8-track of ten unoriginal songs with Johnny Gomez at Cielo Records in Amarillo, Texas.  (*Id.* at 56.)  Martinez did not sign a contract with Cielo Records but understood that it would sell the recordings and would also provide "El Grupo" copies to sell at performances.  (*Id.* at 59.)

---

[1]  The court has carefully reviewed and considered Hacienda's motion for partial summary judgment (Docket Entry No. 67); Hacienda's supplement to that motion (Docket Entry No. 68); Tempest's response (Docket Entry No. 70); Hacienda's reply (Docket Entry No. 78); Tempest's supplement to its response (Docket Entry No. 83); Hacienda's response to that supplemental (Docket Entry No. 88); Tempest's reply to that supplemental response (Docket Entry No. 89); Hacienda's response to that reply (Docket Entry Nos. 93 & 94); and Tempest's reply to that response (Docket Entry No. 95), and all the attached documents.

[2]  The citations to depositions are to the transcript pages, not the .pdf pages.  The citations to documents are to the .pdf pages.

2

Through the late 1960s, "El Grupo" would play at "dances" for $300 to $800 per performance, depending on the length of the performance and the fame of the head liners. (*Id.* at 62.)  During that period, "El Grupo" played a set list of the unoriginal works from the 8-track "so that people would hear them and know them." (*Id.* at 63.)  On occasion, the band would "play other songs that other people had [] recorded." (*Id.*)  The band obtained no licenses to perform these songs and paid no royalties to songwriters or publishers for using the songs at the dances. (*Id.* at 64.)

Sometime in the late 1960s or early 1970s, Martinez's other son, Jesse, and his daughter, Rosie, joined the band.  In 1977, "El Grupo" recorded its second album, a two-song single, with Caldwell Studios in Lubbock, Texas. (*Id.* at 59–59.)  That single's two songs were also unoriginal. (*Id.* at 61.)  Sometime around 1978 or 1979, Ricky and Joe began learning how to manage the band and became the bandleaders.

The band recorded its next album in San Antonio with Joey Lopez. (*Id.* at 65.)  The album had four songs on two singles and the band received an unspecified number of copies. (*Id.*)  Martinez did not sign a contract for this album.  He paid for the studio time and for 45s.  These 45s were "not really" sold.   Instead, they were intended to be "promotional so that ["El Grupo"] could give them to the radio stations, give them to people so that they would know the band's music." (*Id.* at 68.)  The songs were older, unoriginal works.  Martinez did not know who wrote them or how to find their authors.  He did not get a license to record the four songs or to distribute them.

Martinez learned about Hacienda from another musician while in Lubbock. (*Id.*)  The "El Grupo" members decided "to see if [they could] do something with the band."  The musician suggested that the band "'go try out Hacienda and see if that will work.'" *Id.*  In 1981, Martinez,

3

Ricky, Joe, and Jesse went to Hacienda without an appointment and discussed recording opportunities with Roland Garcia, Sr.  He told Martinez that it would cost about $2,000 to record and mix ten songs and that the band would receive 8-tracks and 45s.  (*Id.* at 70–71.)[3]  "El Grupo" decided to record an album with Hacienda.  During this 1981 recording session, "El Grupo" recorded their original works, *Morenita* and *Buscando*.

Martinez testified that he signed no contract with Hacienda when he recorded those two songs.  (*Id.* at 155.)  He also testified that he had no discussions about Hacienda selling the songs to the public.  He believes that when he recorded the songs, he retained ownership.  (*Id.* at 156.)

Hacienda produced a June 5, 1981 invoice for the first recording session.  The invoice identified "Joe and Ricky Martinez" as the client.  Hacienda also produced a receipt dated June 6, 1981 showing the invoice paid in full.[4]  For $1,900, Hacienda recorded and mixed 10 songs, "release[d] 1 - 45 - with Texas Promotion," and distributed 300 8-tracks and 300 45s to the band. (Docket Entry No. 89-2, Martinez Ex. 6, at 2.)  Hacienda also produced invoice number 507 dated September 29, 1981, which shows that "El Grupo" received "300 LAB 8 trks #1006."  (*Id.* at 4). LAB # 1006 is an 8-track titled *La Prieta Casada*.  (Docket Entry No. 89-2 at 74). *Morenita* is track two of that 8-track; *Buscando* is track 7.  (*Id.*; *see also* Docket Entry No. 89-1, Martinez Depo., at

---

[3]  "El Groupo" ended up recording two sets of ten songs.  Martinez remembered paying $2,000 for the first session and thought that "El Grupo" recorded the second session for free because Hacienda was going to make money back by selling whatever was produced.  (*Id.* at 75, 78–80.)  Hacienda's business records did not support that history of events.  After further questioning and a break in the deposition, Martinez remembered that his son Ricky paid $1,900 for the first session and that he paid $2,000 for the second.  The summary-judgment evidence supports that revised understanding.

[4]  Tempest objected to the date of June 5, 1981 because the invoice does not state the year. (Docket Entry No. 89-1, at 73.)  But the receipt of payment on that invoice is clearly dated June 6, 1981.  (Docket Entry No., 89-2, at 3.)

151–54.)  The summary-judgment evidence shows that "El Grupo" recorded those two songs at Hacienda's studios in 1981.

Hacienda also produced an invoice for a second recording session.  The invoice is dated January 7, 1982.  For $2,000, Hacienda recorded and mixed another 10 songs, "[r]eleased 1-45 Texas Promotion," and distributed 150 LPs, 150 8-tracks, and 200 45s to the band.  (*Id.*, Martinez Exhibit 3, at 102.)  The invoice was signed by Martinez, Ricky, and Joe.  (*Id.*)

Hacienda also produced an "option agreement" dated January 11, 1982, signed by Martinez, Ricky, and Jesse.  The agreement stated:

> Hacienda Records &  Recording Studio, Inc. agrees to promote and distribute the recorded material in a professional manner.
>
> The group shall agree to enter into a recording agreement with Hacienda Records for one (1) year with a four (4) year option upon the request of the company within one (1) year after the first release at a royalty rate of three (3) percent after cost of manufacturing and production.
>
> The group shall be allowed to purchase products at distributor price.
>
> | | |
> |---|---|
> | LP's | $2.75 |
> | 8trks | $3.00 |
> | Cassettes | $3.00 |
> | 45's | $ .60 |
>
> This agreement when properly signed by all parties and witnessed, shall constitute a binding agr[e]ement.

(*Id.* at 101.)  The parties dispute whether this option agreement gave Hacienda the authority to sell "El Grupo" songs and albums.  Martinez testified that the group received no royalties under the agreement.  The parties also dispute whether, if the agreement covered any songs, it covered songs recorded under the June 5, 1981 invoice or only those recorded under the January 7,1982 invoice.

On January 11, 1982, Ricky also purchased an additional "50 copies of Lab 8trk # 1006." (Docket Entry No. 89-2 at 6.)

Martinez testified that they were using the 45s and the 8-tracks to pass out and sell at their concerts. "There wasn't . . . much money made in this. Almost all, if not all, of the 45 singles were used as promotion[s.] Pretty much the same thing for the 8-tracks. [Some] sold, but most were given as promotion." (Docket Entry No. 89-1, Martinez Depo., at 160.) Martinez also testified that it was important for the band to have the albums to pass out at the concerts.

In 1982, "El Grupo" changed its name to "El Conjunto Internacional de Ricky and Joe." In 1990, the band changed its name to "The Hometown Boys" after Bobby and Rosie left. Sometime in 1989 or 1990, the band played a concert in San Antonio. At that concert, a family asked them to sign a Hacienda CD that had the *Morenita* and *Buscando* tracks. This was the first time Martinez realized that Hacienda was selling CDs with the songs that the band recorded at the studio in 1981. Martinez and the band never contacted Hacienda about its use of these songs. (*Id.* at 85–86.)

"The Hometown Boys" became popular in the 1990s. Radio stations played their songs frequently and their CD *Mire Amigo* went gold in one week. "The Hometown Boys" have received several awards, including for recognition for the album of the year, vocals of the year, and instrumentalist of the year. In 2010, "The Hometown Boys" were inducted into the Tejano Hall of Fame. (*Id.* at 131.)

In 1994, "The Hometown Boys" made a new recording of *Morenita* for a CD released by Discos MM. (*Id.* at 173.) On June 30, 1994, Martinez Sr. sold the rights to *Morenita* to Musica Adelena (BMI) under a songwriter's contract. Michael Sharkey of Musica Adelena produced the

contract.  Martinez signed it in the presence of his now-deceased sons, Ricky and Joe.  The contract stated that:

> (1) The Writer [Martinez Sr.] hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, all his rights, title and interest in and to certain heretofore unpublished original musical works, as annexed hereto, written and/or composed by the Writer, now entitled, **"Morenita De Ojos Negros"**

(Docket Entry No. 89-1, *Morenita* Agreement, Ex. 4 at 104.)  The agreement stated that a copy of the song would be annexed to the agreement.  Despite apparently diligent efforts, no such copy has been located or produced.

On August 29, 1994, Sharkey registered the song with the United States Copyright Office on Form SR.  The form identified Martinez as the song's author, stated that the work's creation was completed in 1994, and claimed the copyright to the "words music and sound recording."  (Docket Entry No. 63-6, at 3.)  Sharkey deposited one copy of the song with the Copyright Office.  Martinez did not tell Sharkey that he had previously recorded *Morenita* with Hacienda or that Hacienda was distributing an album with that song.

Martinez testified that by the time he signed the *Morenita* agreement, that song had already been put on an album, publicly released, and sold.  (Docket Entry No. 89-1, Martinez Depo, at 17.)  When asked in his deposition whether the song had been previously "released and published," Martinez responded that he thought it had been "on the market."  (*Id.* at 19.)  When asked "who had released and published it," he answered "Hacienda Records," explaining that until 1994, Hacienda was the only studio that had recorded, sold, and distributed *Morenita*.  (*Id.*)

In 1999, "The Hometown Boys" were planning to release another CD with a new recording of *Buscando*.  On February 15, 1999, Martinez Sr. sold the rights to *Buscando* to Musica Adelena (BMI) under a songwriter's contract.  That contract stated:

> (1) The Writer [Martinez Sr.] hereby sells, assigns, transfers and delivers to the Publisher [Musica Adelena (BMI)], its successors and assigns, all his/her rights, title and interest in and to certain heretofore unpublished original musical works, as annexed hereto, written and or composed by the Writer now entitled, **Buscando Un Carino.**

(Docket Entry No. 63-1, *Buscando* Agreement.)  Sharkey registered *Buscando* with the United States Copyright Office on February 23, 1999 on Form SR, seeking a copyright for "words music + sound recording."  On the form, Sharkey stated that Martinez was the work's author, that Musica Adelena claimed copyright ownership through a written contract, and that the work was completed in 1997.

Martinez acknowledged knowing that Hacienda had previously recorded, sold, and distributed the song to the public.  (Docket Entry No. 89-1, at 19.)  Martinez did not tell Sharkey that Hacienda had done so or that he had written the words and music for *Buscando* in 1981 "[b]ecause he was so excited that a new CD was going to come out, [he] didn't even think about it."  (*Id.* at 176.)

In 2000, Musica Adelena sold all rights to its song catalogue to Tempest Publishing, Inc. The "Ownership Transfer Agreement and Assignment of Copyrights and Contract Rights" stated:

> Effective January 1, 2000, [Musica Adelena] hereby sells, assigns, transfers and delivers to [Tempest], its successors and assigns, all right, title and interest in the name Musica Adelena, and all right, title and interest in and to all published and unpublished musical compositions owned and/or administered by Seller, including, but not limited to the contract rights and compositions identified in Exhibit A, which is attached hereto and incorporated herein for all purposes. In consideration for [Musica Adelena's] agreements herein,

> [Tempest] agrees to pay [Musica Adelena] the total sum of $12,500
> as follows, one payment in the amount of $6,250 on or before March
> 1, 2000 and a second payment of the balance of $6,250 on or before
> April 1, 2000.

(Docket Entry No. 63-9 at 3.)   The Transfer Agreement stated that it "constitute[d] a written assignment of copyrights, renewal rights and all derivative rights in and to the musical compositions covered by this agreement, including, but not limited to, those identified in Exhibit A."   (*Id.* at 4.)

Exhibit A stated that Roman Martinez wrote *Buscando* and that Musica Adelena was its publisher.  The exhibit stated that "The Hometown Boys" included *Buscando* on an album entitled *Eres Mia* released under the Fonovisa label in June 1997.  The exhibit also stated that the song had been registered with the United States Copyright Office on February 23, 1999 (SRu 396-338).  (*Id.* at 5.)

*Morenita* was also listed on Exhibit A.  The exhibit identified Roman Martinez as the songwriter and Musica Adelena as its publisher.  The exhibit also stated that the song was registered with the copyright office on August 29, 1994 (SRu 304-2121) and was on "The Hometown Boys" album *Tres Ramitas* (Record No. 30647) released in August 1994 under the Capitol and Sony labels.  That record was again released by Discos MM (Record No. 0647) in March 1998.  *Morenita* was also released on the record *Puro Tesoro* (Record No. 14004) in November 1995 on the Fonovisa label.

On April 5, 2011, Tempest sent Hacienda a demand letter alleging infringement of its copyrights for *Buscando* and *Morenita*.  The letter was sent after Tempest learned that Hacienda had been selling albums with the 1981 versions of the songs that it had recorded.  That same month, Hacienda responded acknowledging that Tempest appeared to hold the copyright to those songs and "respectfully request[ed] a compulsory license for the songs, 'Buscando Un Carino' and 'Morenita

De Ojos Negros' on Hacienda Records (HAC 8204)." (Docket Entry No. 5, Ex. E). In March 2012, Tempest filed this suit.

In the complaint, Tempest alleged that Hacienda "willfully and intentionally exploited" *Buscando* and *Morenita* "without obtaining the appropriate licenses from Tempest, nor a compulsory license." Tempest set out the following specifics as to Hacienda's alleged infringements:

| Title | Copyright Registration | Hacienda Product | Hacienda Product Code |
|---|---|---|---|
| *Buscando* | SRu000396338 | "15 Hits" ("The Hometown Boys") | HAC-8204 C |
| | | "20 Golden Hits" ("The Hometown Boys") | SC-195 |
| | | "La Prieta Casada" ("The Hometown Boys") | HAC-7864 |
| *Morenita* | SRu000304212 | "20 Golden Hits" ("The Hometown Boys") | SC-195 |
| | | "La Prieta Casada" ("The Hometown Boys") | HAC-7864 |
| | | "Grandes Exitos" ("The Hometown Boys") | RAN-114 |

After extensive, and contentious, discovery, Tempest moved for summary judgment on all four songs that it alleged Hacienda infringed. (Docket Entry No. 63.) Hacienda moved for partial summary judgment only as to *Buscando* and *Morenita*. (Docket Entry No. 64.) After extensive briefing on both motions, on October 4, 2013, the court denied Tempest's motion for summary judgment and granted Hacienda's motion for partial summary judgment. On October 8, 2013, Tempest moved the court to rehear its grant of Tempest's motion. For the reasons that follow, the motion for a rehearing is denied.

10

## II.      The Motion for Partial Summary Judgment

### A.      The Applicable Legal Standards

#### 1.      Summary Judgment

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). When the moving party has met its Rule 56 burden, the nonmoving party must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden is not satisfied with some metaphysical doubt as to the material facts, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted). Factual controversies resolve in the nonmoving party's favor, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id.*

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. PRO. 56(c)(1)(A). A party can also show that cited materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PRO. 56(c)(1)(B). The court is not required to go beyond the parts of the record that the parties specifically cite, but it may consider other materials in the record. FED. R. CIV. PRO. 56(c)(3).

Summary-judgment evidence must be competent.  The evidence cannot be hearsay, *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 510 n.5 (5th Cir. 2001), or unsubstantiated assertions, *VRV Development v. Mid-Content Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011). FED. R. CIV. PRO. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075.  Resolving actual disputes of material facts in favor of a nonmoving party "is a world apart from assuming that general averments embrace the specific facts needed to sustain the complaint. . . . It will not do to presume the missing facts because without them the affidavits would not establish the injury that they generally allege." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990).

### 2.    The Writing Requirement under § 204(a)

"[T]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she was the owner of it."  17 U.S.C. § 501(b).  To sue for copyright infringement, a plaintiff must own that copyright.  *See Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (quoting *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 599 U.S. 154 (2010)).  Copyright ownership initially vests in the author of the protected work but "may be transferred in whole or in part by any means of conveyance or by operation of law."  17 U.S.C. § 201(a), (d).  "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such

12

owner's duly authorized agent."  17 U.S.C. § 204(a).  A plaintiff asserting copyright ownership through transfer lacks statutory standing to pursue an infringement claim if there is no signed writing documenting the transfer.

"Section 204(a)'s requirement, while sometimes called the copyright statute of frauds, is in fact different from a statute of frauds."  *Lyrick Studios, Inc. v. Big Idea Productions, Inc.*, 420 F.3d 388, 391 (5thc Cir. 2005) (citing *Konigsberg Intern. Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994)). "Rather than serving an evidentiary function and making otherwise valid agreements unenforceable, under § 204(a) 'a transfer of copyright is simply 'not valid' without a writing.'"  *Id.* (quoting *Konisberg*, 16 F.3d at 357).  When the facts of a writing's existence and content are undisputed, whether the writing satisfies § 204(a) is a question of law.  *See id.* (citing *Radio Television Espanola S.A. v. New York Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999), for the proposition that the issue can be decided on a motion for summary judgment and *Konisberg*, 16 F.3d at 356, for the proposition that the issue can be decided on a motion to dismiss).

As with the statute of frauds, § 204(a) protects authors by memorializing what rights are transferred.  This ensures that "the author 'will not give away his copyright inadvertently' and 'forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price.'"  *Konisberg*, 16 F.3d at 356 (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990)).  The writing requirement describes intangible rights and makes the intellectual property ownership clear and definite, "so that such property will be readily marketable."  *See id.* (quoting *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992)).

The Fifth Circuit has identified three purposes served by the writing requirement:

> First, it ensures that a copyright will not be inadvertently transferred.
> Second, it forces a party who wants to use the copyrighted work to
> negotiate with the creator to determine precisely what rights are being
> transferred and at what price.  Third, it provides a guide for resolving
> disputes; the parties can look to the writing to determine whether a
> use is improper.  In this way, the writing requirement enhances
> predictability and certainty of copyright ownership–Congress'[s]
> paramount goal when it revised the [Copyright] Act in 1976.

*Lyrick*, 420 F.3d at 392 (quotations and citations omitted).  "A clear writing effecting an assignment

signals to the parties *and the world* that the assign is the party that owns the [copyright] and is

authorized to exclude others from use."  *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,

726 F.3d 62, 74 (2d Cir. 2013) (emphasis added) (analyzing the § 204(a) writing requirement to

understand a similar requirement under the Lanham Act).

"If the copyright holder agrees to transfer ownership to another party, that party must get the

copyright holder to sign a piece of paper saying so.  It doesn't have to be the Magna Charta; a one-

line pro forma statement will do."  *Effects Assocs.*, 908 F.2d at 557.  The writing requirement is

simple: "in order for a grant of an exclusive writing to be valid–put it in writing.  If the parties really

have reached an agreement, they can satisfy § 204(a) with very little effort."  *Radio Television*, 183

F.3d 922 at 929.

**B.     Analysis**

The summary-judgment evidence shows that the writing Martinez signed transferring his

copyrights in the two songs at issue limited the transfer to his rights "in and to certain *heretofore*

*unpublished* original musical works." (Emphasis added.)  The evidence also shows, and Tempest

has conceded, that the songs Hacienda used on the recordings giving rise to the infringement claims

were previously published before Martinez entered into those agreements.  Sharkey signed a

declaration that Tempest filed with its response to Hacienda's motion for partial judgment on the

pleadings.  The declaration  states that "[h]ad [he] known the works were previously released by Hacienda, [he] would have modified the standard form [songwriter's agreement]."  (Docket Entry No. 22-4 at ¶ 8.)  As a result, the writing did not, as a matter of law, transfer Martinez's copyrights in these two songs.

Despite these undisputed facts regarding the content of these writings, Tempest argues that Musica Adelena intended to acquire, and Martinez intended to transfer, all Martinez's rights to the two songs at issue, as well as to his other songs that had previously been published.  To support that claim, Tempest points to Sharkey's declaration and Martinez's declaration and deposition, prepared for this litigation.  Tempest argues that this evidence of the parties' intent should control the court's understanding of the writings and that Hacienda's summary-judgment motion should be denied.

State contract law governs the construction of copyright assignments, licenses, and other writings effectuating transfers.  *See P.C. Films Corp. v. Turner Entm't Co.*, 954 F. Supp. 711, 714 n.6 (S.D.N.Y. 2007); *Key Maps, Inc. v. Pruitt*, 470 F. Supp. 33, 38 (S.D. Tex. 1978) ("Principles of contract law are generally applicable in the construction of copyright assignments, licenses, and other transfers of rights.").  The agreements between Musica Adelena and Martinez state that Texas law controls.  Under Texas law, a court interprets a written contract based on the contracting parties' intent.  *See Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 330 (Tex. 1984).  "[I]n the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls." *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518, 12 Tex. Sup. Ct. J. 25 (Tex. 1968). In determining the objective intent, the contract ordinarily should be "given its plain grammatical meaning."  *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529, 30 Tex. Sup. Ct. J. 333 (Tex. 1987) (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92,

9 Tex. Sup. Ct. J. 187 (Tex. 1966)).  "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract in light of the circumstances existing at the time the contract was entered into."  *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex. 1987).

> If [an] agreement is worded so that this Court can ascertain a certain or definite meaning, it is not ambiguous.  If the agreement, however, is reasonably susceptible to more than one interpretation, it is ambiguous.  A contract is not ambiguous merely because the parties disagree upon the correct interpretation or upon whether it is reasonably open to just one interpretation.  If the agreement is ambiguous, summary judgment is improper because interpretation of the agreement is a fact question for the jury.

*Childers v. Pumping Systems Inc.*, 968 F.2d 565, 569 (5th Cir. 1992).

Applying these Texas contract-interpretation principles, the written agreements between Musica Adelena and Martinez limited the rights transferred to the rights to "heretofore unpublished" works.  Under the Copyright Act, "publication" is a defined term.  *See* 17 U.S.C. § 101 ("'Publication' is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending."); *compare* 17 U.S.C. § 408 (b)(1) ("[T]he material deposited for registration shall include . . . in the case of an unpublished work, one complete copy or phonorecord[.]"), *with* 17 U.S.C. § 408(b)(2) ("[T]he material deposited for registration shall include . . . in the case of the published work, two complete copies or phonorecords of the best edition[.]").  Commonly used, to "publish" means "to prepare and produce for sale"; "to make generally known"; or "to disseminate to the public."  *Merriam Webster*, Merriam-Webster.com, *available at* http://www.merriam-webster.com/dictionary/publish.

When a contract is unambiguous, the court cannot use parol evidence to vary or contradict the contract terms.  *See Dynergy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 170 n. 23 (Tex. 2009).  Here, the contract unambiguously transfers only rights in and to previously

unpublished original musical works.  By the plain contract terms, Musica Adelena received only the rights to the version of the two songs that, at the time of contracting, were previously unpublished.

Tempest emphasizes Martinez's testimony that he intended to convey all rights in the songs to Musica Adelena and that he misunderstood what the word "unpublished" meant. (Docket Entry No. 89-1, Martinez Dep., at 168–69).  According to Martinez, he thought "unpublished" meant that he had not entered into a previous publishing agreement.  Because the contract is unambiguous, this evidence of subjective intent that varies and contradicts the contract terms is inadmissible.  The Fifth Circuit has held that testimonial evidence of what the parties intended contract terms to mean should be excluded from the ambiguity determination.  *See Fireman's Fund Ins. Co. v. Murchison*, 937 F.2d 204, 207 (5th Cir. 1991)  ("In construing a contract, the court must give meaning to each of its provisions, in light of the circumstances surrounding the contract's execution, excluding statements of parties as to what they intended.").  Martinez's testimony as to his subjective understanding of the term "published" is inconsistent with its meaning under both the Copyright Act and common usage.  The agreements are not ambiguous, and the court cannot use parol evidence to create an ambiguity.  Under the agreements, Musica Adelena, and therefore Tempest, did not acquire rights to the previously published songs, including the two at issue.  Tempest cannot sue Hacienda for infringement for its use of the 1981 versions of those two songs under the Copyright Act.

It is correct that "the parol evidence rule does not apply when a court is determining whether there was a mutual mistake, even if the contract is unambiguous or fully integrated," *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 408 (5th Cir. 2012) (citing *Marcuz v. Marcuz*, 857 S.W.2d 623, 627 (Tex. App. –Houston [1st Dist.] 1993) ("[T]he fact that the "written instrument is couched in unambiguous language, or that the parties knew what words were

and were aware of their ordinary meaning, or that they were negligent in failing to discover the mistake before signing the instrument, will not preclude the admission of parol evidence or relief by reformation.").  A mutual mistake can provide a basis for a court to avoid or reform a contract in disputes between the contracting parties.  *See Johnson v. Connor*, 260 S.W.3d 575, 580 (Tex. App. –Tyler 2008) (describing mutual mistake and contract avoidance); *Santos v. Mid-Continent Refrigerator Co.*, 471 S.W.2d 568, 569 (Tex. 1971) (describing mutual mistake as an affirmative defense); *Estes v. Republic Nat. Bank of Dallas*, 462 S.W.2d 273, 275 –76 (Tex. 1970) (describing elements for contract reformation).

The mutual mistake doctrine does not provide a basis to deny Hacienda partial summary judgment.  First, Tempest did not allege the elements of a mutual mistake or seek reformation.  Second, this is not a dispute between the contracting parties, but between a successor to one of those parties and a third party.  Additionally, the record is clear that the contracting parties did not make a *mutual* mistake.  If and to the extent Musica Adelena and Martinez contracted based in part on a mistaken view of what the contract meant or did, each had a different mistake.  Martinez's mistake, according to his testimony, was a misunderstanding of what "unpublished" meant.  Sharkey's declaration shows that he correctly understood the term "unpublished" as defined under the Copyright Act and common usage.  But he assumed, or believed, that the two songs at issue had not previously been published.  Musica Adelena understood the meaning of the word "unpublished," but was mistaken as to the historical facts about the songs' publication history.

Even if there was a unilateral mistake on the part of one contracting party, that would not warrant reforming a contract absent some inequitable conduct from other party.  *See Hill v. Imperial Sav.*, 852 F. Supp. 1354, 1369 (W.D. Tex. 1992) (citing *Lathem v. Richey*, 772 S.W.2d 249, 254

(Tex. App. –Dallas 1989, writ denied); *RGS, Cardox Recovery, Inc. v. Dorchester Enhanced Recovery Co.,* 700 S.W.2d 635, 640 (Tex. App.–Corpus Christi 1985, writ ref'd n.r.e.); *but see Marcuz*, 857 S.W.2d at 625 ("Unilateral mistake by one party, and knowledge of that mistake by the other party, is equivalent to mutual mistake. *Davis v. Grammar*, 750 S.W.2d 766, 768 (Tex. 1988).").

In the alternative, relying on a line of cases that developed from the Second Circuit's decision in *Eden Toys*, Tempest argues that as a third-party infringer, Hacienda may not question the sufficiency of the writing transferring Martinez's copyright ownership to Musica Adelena. *See Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27 (2d Cir. 1982). The argument is basically that because Tempest has a contract transferring ownership of *a* copyright, Hacienda does not have standing to contest whether that contract transferred *these* particular copyrights. Before addressing this line of cases, it is worth noting that Hacienda does not challenge the validity or the sufficiency of the writings that transferred ownership in unpublished songs. Hacienda challenges the absence of any writing that transferred Martinez's rights to his previously published songs. The only writing in the evidence does not transfer those rights. Instead, the writing transfers the rights to "previously unpublished" songs, which do not include the two songs at issue.

*Eden Toys* involved the copyright to the famous Paddington Bear character and the license to use it. In 1975, Paddington and Company, Limited, the copyright owner, and Eden Toys entered into a written license agreement. The agreement listed the items Paddington licensed Eden Toys to produce using the famous bear. The agreement did not list "adult clothing" as a licensed product. In November 1979, Eden Toys discovered that Florelee had been producing and selling a nightshirt with a Paddington Bear print. In 1980, Eden Toys and Paddington amended their licensing

agreement to give Eden Toys the "exclusive North American rights to produce any Paddington Bear product," with certain restrictions.  After discovering a second nightshirt with the Paddington Bear print, Eden Toys sued Florelee in April 1980 alleging copyright infringement.  Florelee asserted that Eden Toys could not assert an infringement claim because it did not obtain ownership of the copyright through a signed writing as required by § 204(a).  This section had been added to the Copyright Act in 1978.

Eden Toys responded that it had been operating under an informal understanding with Paddington that it had rights to any Paddington Bear product except for certain irrelevant restrictions.  In 1980, Eden Toys and Paddington entered into another written agreement to formalize this oral understanding that had been in place to amend the 1975 written contract.  In the litigation, the defendant raised the absence of a contemporaneous writing licensing adult clothing featuring Paddington Bear as a defense to the infringement claim.  The issue was whether the after-the-fact writing memorializing an earlier oral agreement met the § 204 writing requirement for an effective transfer.

The Second Circuit recognized that an "informal grant of an exclusive license seemingly must fail in light of the statute of frauds provision of the new Act."  *Id.* at 36.  Nonetheless, "since the purpose of [that] provision is to protect copyright holders from persons mistakenly or fraudulently claiming oral license," the court held that "the 'note or memorandum of transfer' need not be made at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement."  *Id.*  The court noted that in "*this case*, in which the copyright holder appears to have no dispute with its licensee on th[e] matter,

it would be anomalous to permit a third party infringer to invoke this provision against the licensee."

*Id.* (emphasis added).  The court remanded with this statement:

> If Paddington granted Eden an informal exclusive license to sell
> Paddington Bear products in the market in which Florelee sold–adult
> clothing–*and that informal license was later confirmed in a writing*
> signed by Paddington, Eden may sue in its own name, without joining
> Paddington for infringement of any Paddington-owned copyrights in
> that market. . . .

> If the district court finds that no such informal understanding existed,
> *or that such an understanding was never memorialized*, Paddington,
> which has expressed a willingness to be made a co-plaintiff in this
> lawsuit . . . should be joined as a plaintiff.

*Id.* (emphasis added).  *See also Imperial Residential Design, Inc. v. Palms Development Group, Inc.*,

70 F.3d 96, 99 (11th Cir. 1995) (citing *Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d

27, 36 (2d Cir. 1982));  *Films by Jove, Inc. v. Berov,* 154 F. Supp. 2d 432, 477 (E.D.N.Y. 2001)

(citing *Eden Toys*, 697 F.2d at 36 and other applications of that case).

      Tempest's reliance on this line of cases is misplaced.  *Eden Toys* is important, but limited.

Under that case, an "after-the-fact writing can validate an agreement from the date of its inception,

at least against challenges to the agreement by third parties."  *Lyrick*, 420 F.3d at 392).  But *Eden*

*Toys* allows a prior, otherwise valid, agreement that does not satisfy § 204 to transfer the copyright

interests at issue if an after-the-fact writing memorializing that agreement does satisfy § 204.  *See*

*Barefoot Architecture, Inc. v. Bunge*, 632 F.3d 822 (3d Cir. 2011); *Magnuson v. Video Yeseteryear*,

85 F.3d 1424 (9th Cir. 1996);  *Imperial Residential,* 70 F.3d at 99.

      The Second Circuit noted that it would be anomalous to permit a third-party infringer to

invoke § 204 against a copyright transferee who had obtained the copyright through an informal and

undisputed understanding, and the understanding was later memorialized in a writing.  The Second

Circuit remanded for the district court to determine whether the copyright interests asserted were in fact memorialized in a writing. If so, the court then had to determine: (1) whether the parties asserting that they had agreed to transfer the copyright interest had in fact agreed to do so, despite the absence of a writing memorializing that agreement; and (2) whether that agreement was later memorialized in a written signed document. If the district court answered either of those questions in the negative, the Second Circuit would require the original copyright owner — the would-be transferee — to be joined as a plaintiff.

This case is different. In this case, the original agreements between Musica Adelena and Martinez were valid and sufficient writings under § 204(a). As a matter of contract interpretation, those agreements transferred only rights in songs that were "heretofore unpublished." The two songs at issue were previously published. The rights to those songs were not transferred in the original § 204(a) written transfers. When this court ruled on the motion for partial summary judgment, the only evidence of a written § 204(a) transfer were the agreements transferring the rights to previously published songs. Averments as to the parties' subjective intent when they entered into a written contract 30 years ago, inconsistent with that contact, cannot change the meaning of the original contract. Nothing in *Eden Toys* supports an argument that after-the-fact general averments about what was intended in the earlier written transfer agreement operates to change the clear meaning of that earlier agreement. When, as here, the earlier agreement satisfied the § 204(a) writing requirement from the outset, *Eden Toys* does not affect the analysis or outcome.

*Eden Toys* and subsequent cases do not stand for the proposition that an assignee can sue on either an agreement never memorialized in writing under § 204(a) or on an agreement that was

memorialized properly under § 204(a) but did not transfer the allegedly infringed right.  Courts may

be "hesitant to allow an outside infringer to challenge the timing or technicalities of the copyright

transfer" when the writing comes after an informal transfer of rights.  *Lyrick*, 420 F.3d at 392 (citing

*Eden Toys*).  But the issue in this case does not arise from the timing or technicality of a transfer.

Hacienda does not argue that the writing transferring the song rights at issue is invalid due to a

technicality or timing.  Instead, Hacienda challenges Tempest to point to a signed writing that

transferred the rights it is asserting.  Musica Adelena itself acknowledged that a different contract

would have to be written to transfer Martinez's rights to both published and unpublished songs.  The

absence of such a writing leads the court to conclude that Tempest did not acquire the rights to

*Buscando* and *Morenita* and cannot sue Hacienda for infringement as to those songs.  *See Triple Tee*

*Golf, Inc. v. Nike Inc.*, No. 4:04-CV-302A, 2007 WL 4260489 (N.D. Tex.) (rejecting the argument

that *Imperial Residential*, 70 F.3d at 96, prohibits a defendant from asserting an invalid assignment

in a trade secrets case), *aff'd* 281 Fed. App'x 368 (5th Cir. 2008) (nonprecedential); *but see Capital*

*Concepts, Inc. v. Mountain Corp.*, No. 3:11-CV-00036, 2012 WL 6761880 (W.D. Va. Dec. 30,

2012) (concluding that improper description of copyrights to works improperly described as "works

made for hire" as defined in the Copyright Act was a technical error that the third-party infringer

could not use as a defense when the contract, as a whole, clearly established the transfer of the rights

asserted).

      Neither result the parties advocate is without problems.  The court recognizes the tension that

§ 204(a) and the *Eden Toys* line of cases creates with the contract law the court must use to evaluate

transfer agreements under § 204(a).  The approach Hacienda takes, which this court finds required

under the Copyright Act and case law, does present the problem of allowing a third-party to avoid

liability for its alleged infringement of a transferred copyright even when the contracting parties agree that they wanted to transfer that copyright. The approach Tempest takes, which this court finds inconsistent with the Copyright Act, allows parties who have agreed in writing to transfer a specified copyright interest to later revise that agreement to expand the interests they transferred through declarations and oral testimony and then seek damages for intervening uses that allegedly infringe the expanded transfer. Tempest has not pointed the court to a case in which the Fifth Circuit has allowed a plaintiff to sue for copyright infringement without a document memorializing ownership of that right, as the statute requires.

For these reasons, the court granted Hacienda's motion for partial summary judgment from the bench and dismissed Tempest's claims of copyright infringement on the songs *Morenita* and *Buscando* on October 4, 2013.

## III.    The Motion for Rehearing

Four days after the court ruled from the bench, Tempest filed a motion for rehearing and two new assignments from Martinez which included all rights in *Morenita* and *Buscando*, as well as any accrued causes of action. That motion cited no legal authority.

### A.    The Standard for a Motion to Reconsider

A motion for reconsideration "will be treated as either a motion 'to alter or amend' under Rule 59 (e) or a motion for 'relief from judgment' under Rule 60(b)." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167 (5th Cir. 1990). "A Rule 59(e) motion 'calls into question the correctness of a judgment.'" *Templet v. HyrdoChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). Invocation of the rule is improper where a party only seeks to rehash evidence, legal theories, or arguments which could have

been offered or raised before the entry of judgment.  *See id.* at 479.  Instead, the motion is to be used for the narrow purposes of allowing a district court to correct a manifest factual error, to correct a manifest legal error, or to introduce newly discovered evidence.  *See id.*

Tempest has not argued that this court erred as to the law or as to the facts that were before it.  The new assignment contracts Tempest drafted and Martinez signed after the court ruled on the motion for partial summary judgment are not newly discovered evidence; they are newly created evidence.  And they were created after, rather than before, the court ruled on pending motions for summary judgment that raised these very issues.  The Fifth Circuit has held "that an unexcused failure to present evidence available at the time of summary judgment provides a valid basis for denying a subsequent motion for reconsideration."  *Id.* (citing *Russ v. Int'l Paper Co.*, 943 F.2d 589, 593 (5th Cir. 1991)).  "The proffered evidence must be newly discovered rather than newly created." *Waite v. Cage*, (citing *Biesek v. Soo Line R.R. Co.,* 440 F.3d 410, 412 (7th Cir. 2006)).

The submission of these new assignment contracts do not warrant reopening the summary-judgment record as to the two songs at issue.  The court's ruling was based on a thorough and exhaustive consideration of the law and facts presented over the course of a year.  The court permitted the parties to submit multiple rounds of supplemental briefing and to add evidence to the record as their arguments developed.  Hacienda filed motions over a year ago raising the argument that Tempest could not prevail because Martinez had not transferred his interest in these previously published songs.  Hacienda vigorously maintained this position and argument in pursuing partial summary judgment.  To reopen the record on the eve of trial after Tempest changed the facts underlying the court's ruling would significantly prejudice Hacienda.  As Hacienda indicated, trial was around the corner, "the parties revised their pre-trial filings, and their trial presentations, witness

lists, witness testimony, witness schedules and travel plans, evidence to be presented, and exhibits [were] preadmitted, and motions in limine [had] been ruled on, all in reliance on the granting of" the partial summary judgment motion. (Docket Entry No. 112 at 7). It is worth noting that the new contracts Tempest submitted represent a substantial revision to the previous songwriter's agreements. They do not just insert the word "unpublished" to cover the two songs at issue.

The Fifth Circuit "has identified two important judicial imperatives relating to a motion [for reconsideration]: 1) the need to bring litigation to an end; and 2) the need to render just decisions on the basis of all the facts. The task of the district court is to strike the proper balance between th[e]se competing interests." *Templet*, 367 F.3d at 480. To allow Tempest to create new facts for the sole purpose of changing the outcome of a summary-judgment ruling, on the eve of trial, would disrupt the balance between the competing interests this court must consider.

In addition to the prejudice to Hacienda, ruling otherwise would disrupt the judicial process. In the context of patents and trademarks, the Federal Circuit has noted that "permitting non-owners . . . the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day." *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 780 (Fed. Cir. 1996) (citations omitted). Accordingly, the court denies the motion for reconsideration because the evidence is newly created, after the court granted partial summary judgment for the defendant, on the eve of trial, and reopening the matter would cause both substantial prejudice and delay.

Even if the court had considered the newly created contracts, the outcome would not change. The contracts were substantially revised from the songwriter's agreements Martinez and Sharkey signed. The revisions are under the auspice of making what the words say consistent with what the parties testified — years later — they had intended to say when the original songwriter's agreements were drafted and signed. The courts are uncomfortable with such long-delayed writings produced under similar justifications in the context of the § 204(a) writing requirement.

For example, the Ninth Circuit was not satisfied with a writing that came three and a half years after an alleged oral agreement to transfer a copyright because the writing was not substantially contemporaneous with the oral agreement. *Konigsberg*, 16 F.3d at 357. In reaching that conclusion, the Ninth Circuit stated that it "ha[d] doubts about whether a later writing can validate a purported transfer that substantially predates the writing." *Id.* at 357 n. 3. Later, a divided panel of the Ninth Circuit took a step back from *Konigsberg* and held "sufficient a writing that dated more than fourteen years after the oral transfer." *See Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 830 (3d Cir. 2011) (citing *Konigsberg*, 85 F.3d at 1424). The Third Circuit explicitly rejected the argument that the writing had to be substantially contemporaneous with the oral agreement. *Id.* The Fifth Circuit has acknowledged this "substantially contemporaneous" dispute without deciding its own views on the issue. *See Lyrick*, 420 F.3d at 394 ("Here, the document is more contemporaneous [than the document in *Konigsberg*] . . . .").

In this case, even if the Fifth Circuit adopted the most permissive approach, it would not change the outcome. Not only were the new contracts created and produced so long after the original transfer agreements, these new contracts did not serve the limited purpose of memorializing what the parties had earlier stated in their informal oral agreement. Martinez stated that he did not

27

tell Sharkey that the songs had been previously published at the time the original agreements were entered; Sharkey declared he would have needed to write an entirely separate contract had he known that the songs were previously published.  Instead, these new contracts significantly changed, contradicted, and varied what the parties had agreed to when they signed the earlier songwriter's agreements.   These facts go beyond what the Ninth Circuit and Third Circuit allowed in their approaches to the contemporaneousness requirement.

The court denies the motion for rehearing.  In so doing, the court rejects the newly proffered contracts and does not consider them.  *Templet*, 367 F.3d at 477 ("[I]f the district court refuses to consider the [new] materials, the reviewing court applies the abuse of discretion standard [which requires the] district court's decision and decision-making process need only be reasonable." (citations omitted)).  Having done so, the court notes that these new contracts do not appear likely to change the outcome even if they were considered.

## IV.    Conclusion

For the foregoing reasons, the court granted Hacienda's motion for partial summary judgment on October 4, 2013 and denies Tempest's motion for a rehearing or for reconsideration of that ruling based on the newly created contracts proffered on October 8, 2013.

The court's findings of fact and conclusions of law on the bench trial will issue separately.

SIGNED on November 7, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

28