**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TEMPEST PUBLISHING, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-736 |
| | § | |
| HACIENDA RECORDS AND RECORDING | § | |
| STUDIO, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION SETTING OUT PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.    Introduction:  The Issues**

Tempest Publishing, Inc. sued Hacienda Records and Recording Studio, Inc., Hacienda Records, L.P., and Latin American Entertainment, LLC (together, "Hacienda"), alleging infringement of the copyrights to four songs and seeking damages and attorneys' fees under the federal Copyright Act, 17 U.S.C. § 101 *et seq*.  The court granted Hacienda's motion for partial summary judgment, dismissing Tempest's claims relating to two of the songs, *Buscando un Cariño* and *Morenita de Ojos Negros*.  (Docket Entry No. 104.)

The court held a bench trial on the remaining two songs, *Mi Amor es Tuyo* and *Somos Dos Gatos*.  The parties admitted exhibits and presented argument.  At the close of Tempest's case, the court granted a directed verdict in Hacienda's favor on one of the songs, *Mi Amor es Tuyo*, leaving Tempest's copyright-infringement claim as to *Somos Dos Gatos* and both parties' requests for attorneys' fees.

Based on the pleadings; the briefs and exhibits; the testimony, the arguments of counsel, and exhibits presented at the three-day bench trial; the posthearing briefs and submissions; and the applicable law, the court enters the following findings of facts and conclusions of law:[1]

- •  Hacienda infringed Tempest's copyright for the song Somos Dos Gatos;

- •  the infringement was not innocent;

- •  the infringement was willful;

- •  Hacienda must pay Tempest $5,000 as damages; and

- •  no party recovers its attorneys' fees.

The reasons for these findings and conclusions are explained in detail in this Memorandum and Opinion.

## II.    The Applicable Law

### A.    Copyright Infringement

"To maintain a copyright infringement claim, the owner of the copyright must have registered it."  *Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.*, 226 F.3d 387, 392 (5th Cir. 2000) (citing 17 U.S.C. § 411(a)).  "An action for copyright infringement requires the plaintiff to show 'ownership' of the material and 'copying' of the material by the defendant."  *Id.* at 392–93 (citing *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991)); *see also Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) ("To prove copyright infringement a party must show that '(1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.'" (quoting *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d

---

[1] Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

357, 367 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010))).  To establish the "ownership" element, the plaintiff must show that the material is original and can be copyrighted, and that the plaintiff has complied with all statutory formalities. *Id.*  The "copying" element is met by proving "(1) factual copying and (2) substantial similarity." *Id.* at 393 (quoting *Lakedreams*, 932 F.2d at 1107).

"'A copyright owner may grant a license in his work, thereby waiving his right to sue the licensee for copyright infringement.'" *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 771 (N.D. Tex. 2006) (quoting *Pavlica v. Behr*, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005)).  "[T]he existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 451 n. 5 (5th Cir. 2003).  The defendant has the burden of proving that a license exists. *Id.*; *see also Ramirez v. Nichols*, No. 10-20806, 496 Fed. App'x 383, 2012 WL 5377683, at *1 (5th Cir. 2012) (unpublished) ("Defendants maintain they had either an exclusive or implied license to exploit Ramirez' and Guerrero's works.  The burden is on Defendants to prove having a license because it is an affirmative defense to a copyright-infringement claim."); *Lulirama Ltd. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 884 (5th Cir. 1997) (citing *CMS Software Design Sys., Inc. v. Info Designs, Inc.*, 785 F.2d 1246, 1248 (5th Cir. 1986)).

Any person may obtain a compulsory license to use a musical composition even if the music publisher cannot be located or refuses to grant a license.  17 U.S.C. § 115(b)(1).  To obtain a compulsory license, the distributor must, before or within 30 days of making a recording, and before distributing any copies, serve notice on the copyright owner declaring the distributor's intent to seek a compulsory license.  If the copyright owner cannot be located, the distributor may file the notice

3

of intention with the copyright office.  *Id.*  The distributor may use the song if it files the required

notice, credits the copyright owner, and pays the owner royalties at a rate set by statute.  17 U.S.C.

§ 115(c).

###### B.      The Transfer of an Ownership Interest in Intellectual Property

A transfer of ownership interest in intellectual property generally "is not valid unless an

instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the

owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).  "Section

204(a)'s requirement, while sometimes called the copyright statute of frauds, is in fact different from

a statute of frauds."  *Lyrick Studios, Inc. v. Big Idea Productions, Inc.*, 420 F.3d 388, 391 (5th Cir.

2005) (citing *Konigsberg Intern. Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994)).  "Rather than

serving an evidentiary function and making otherwise valid agreements unenforceable, under

§ 204(a) 'a transfer of copyright is simply 'not valid' without a writing.'"  *Id.* (quoting *Konisberg*,

16 F.3d at 357).  "If the copyright holder agrees to transfer ownership to another party, that party

must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna

Charta; a one-line pro forma statement will do."  *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557

(9th Cir. 1990).  State contract law governs the construction of copyright assignments, licenses, and

other writings effecting transfers of intellectual property.  *See P.C. Films Corp. v. Turner Entm't

Co.*, 954 F. Supp. 711, 714 n. 6 (S.D.N.Y. 2007); *Key Maps, Inc. v. Pruitt*, 470 F. Supp. 33, 38 (S.D.

Tex. 1978) ("Principles of contract law are generally applicable in the construction of copyright

assignments, licenses and other transfers of rights.").

In Texas, a valid contract requires: (1) an offer; (2) an acceptance in strict compliance with

the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; (5) execution

and delivery of the contract with the intent that it be mutual and binding; and (6) consideration.  *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 670 (Tex. App. — Ft. Worth 2010, no pet.).

In interpreting a contract, the court's primary concern "is to ascertain the true intentions of the parties as expressed in the instrument."  *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011).  A court considers a contract as a whole.  *See id.* ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.").  "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent."  *DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).  A contract is ambiguous only if, considered as a whole, it is "reasonably susceptible to more than one meaning."  *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).  A court will not find a contract ambiguous if it may properly be given a certain legal meaning or interpretation.  *J.M. Davidson*, 128 S.W.3d at 229.  "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity."  *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (*citing Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732–33 (Tex. 1981); *Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 288 F.3d 651, 657 (5th Cir. 2002)).  "The objective intent as expressed in the agreement controls the construction of an unambiguous contract, not a party's after-the-fact conduct."  *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006).

III.    **Findings of Fact**

    A.    **The Parties**

Hacienda Records LP is an independent music-recording studio based in Corpus Christi, Texas.  Latin American Entertainment, LLC, is its general partner.  In 1999, Hacienda Records acquired the assets of Hacienda Records & Recording Studio, another independent music-recording studio based in Corpus Christi.  Hacienda has recorded and released over 1,000 Tejano music albums.  (Garcia Testimony, Oct. 22 Tr., Vol. 2, p. 15).  Hacienda and its executive vice-president in charge of licensing, Rick Garcia, are experienced in the music industry and familiar with the process for obtaining a license to use a copyrighted song.  (*Id.* at pp. 15–19).  Hacienda has released over 1,000 Tejano albums and Garcia has filed copyright registrations for songs he composed.  (*Id.* at pp. 15–16).

Tempest Publishing Inc., a Texas corporation, is a music publisher doing business as Musica Adelena and Musica Arroz.

    B.    ***Somos Dos Gatos***

Joe Martinez and Lee Quirino composed *Dos Gatos*, and in March 1992, signed a Songwriters Contract granting the exclusive rights to *Dos Gatos* to Tessitura Music Trust. (Tempest Ex. 10; Hacienda Ex. 22).  The first paragraph of the Songwriters Contract stated: "The Writer hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, all his rights, title and interest in and to certain heretofore unpublished original musical works, as annexed hereto, written and/or composed by the Writer, now entitled, 'DOS GATOS.'" (*Id.*).  Nothing was annexed to the Songwriters Contract.

6

Tessitura Music Trust ("Tessitura") registered *Dos Gatos* with the copyright office on April 20, 1992. (Tempest Exs. 2, 3; Hacienda Ex. 15). Michael Sharkey, who worked for Tessitura in 1992, filed the copyright-registration application, paid the fee, and sent the copyright deposit with a recording of the song. (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 51, 55; Tempest Ex. 4). Tessitura registered the song with BMI and ASCAP, two well-known music rights management companies. Tessitura also registered it with the Harry Fox Agency, a third-party agent that acts as an intermediary between distributors and copyright holders for licensing. (Sharkey Testimony, Oct. 21 Tr., Vol. 2, p. 79). The Harry Fox Agency was authorized to grant licences to record the song on Tessitura's behalf.

Martinez, one of the song's composers, was a member of the "Hometown Boys," a popular Tejano band. The Hometown Boys recorded *Dos Gatos* in 1992 and released it under the title *Somos Dos Gatos* as part of an album. (Sharkey Testimony, Oct. 21 Tr., Vol. 2, p. 54; Vol. 3, p. 48). Sharkey filed a correction form with the Copyright Office to change the name of the copyrighted song from *Dos Gatos* to *Somos Dos Gatos* on August 24, 1992. (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 57–58; Tempest Ex. 2).

Despite the attention it has received in this lawsuit, *Somos Dos Gatos* was not popular. It was not played on the radio and never featured on any billboard charts. (Hacienda Exs. 13, 32). Tempest had paid no mechanical royalties to Martinez and Quirino for *Somos Dos Gatos* since 2004. (Hacienda Exs. 23, 27, 29, 31).

### C.   Musica Adelena

In January 1993, Modern Music Ventures, Inc., Tessitura's parent company, ended Tessitura's operations and created Musica Adelena. Tessitura assigned its interest in *Dos Gatos* and

the rest of its catalog to Musica Adelena on January 1, 1993.  (Tempest Ex. 13; Hacienda Ex. 33).

Musica Adelena administered the rights to *Somos Dos Gatos* from 1993 to 1998.

Modern Music Ventures controlled a company, Discos MM, that recorded artists who had publishing contracts with Musica Adelena.  The two companies represented the same Tejano artists. (*Id.*).  Musica Adelena administered the publishing rights for the songwriters, while Discos MM recorded songs and released the albums.  (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 67–73). Martinez recorded with Discos MM, but Musica Adelena held the copyright to *Somos Dos Gatos*. (Tempest Ex. 10; Hacienda Ex. 22).  Sharkey testified credibly that Musica Adelena, not Discos MM, was responsible for granting licenses to use copyrighted songs on albums.  Sharkey would contact Harry Fox to ensure that licenses were granted for albums Discos MM recorded and released.  (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 72–73).

At some point after 1993, Musica Adelena's copies of the Songwriters Contract between Tessitura, Martinez, and Quirino were modified by handwritten additions.  On a copy signed by only Martinez and Tessitura, the handwritten word "SOMOS" was added in front of "DOS GATOS," and "Tessitura Music Trust" was crossed out and replaced with "Musica Adelena."  (Defendants' Ex. 22).  On a copy all of the parties signed, "Tessitura Music Trust (BMI)" was crossed out and replaced with "Musica Adelena (BMI)."  (Tempest Ex. 10).  Sharkey testified that he modified the contracts after the song's copyright registration was changed to *Somos Dos Gatos* and after the contracts and copyrights were transferred to Musica Adelena.  (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 53, 55).  Sharkey also testified that he made the changes as notes to himself and did not show the modified contracts to Quirino or Martinez.  (*Id.* at p. 55).  The court finds that Sharkey's testimony on this point was credible.

### D.     Shark Communications

Modern Music Ventures was dissolved in July 1998.  Michael Sharkey purchased all of its copyrights and songwriter contracts and formed a new company, Shark Communications, Inc. (Sharkey Testimony, Oct. 21 Tr., Vol. 2, p. 65).  Shark Communications bought the rights to the name "Musica Adelena" and continued to operate under that name.  (*Id.*).  Modern Music Ventures sold its recording contracts and the recording company label, Discos MM, to Discos MM's owner and operator, Max Silva.  (*Id.*).

### E.     Tempest

Shark Communications sold Musica Adelena and all of its copyrights and contracts to Tempest Publishing in May 2000.  (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 67–68; Tempest Ex. 12).  The copyright to *Somos Dos Gatos* was among those transferred in the sale.  (Sharkey Testimony, Oct. 21 Tr., Vol. 2, p. 85; Tempest Ex. 12).  Musica Adelena became a division of Tempest and continued to administer the rights to *Somos Dos Gatos*.  (Tempest Exs. 12, 33).  Discos MM continued to manage the recording activities for the artists who signed with Musica Adelena.

Sharkey testified credibly that when he sold Musica Adelena to Tempest, he told Harry Fox, BMI, and ASCAP about the sale and about the transfer of Musica Adelena's copyright ownership in certain songs.  (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 78–79).  Sharkey and Tempest did not inform Tejano-music distributors, including Hacienda, that Tempest had purchased Musica Adelena.  (Showalter Testimony, Oct. 21 Tr., Vol. 4, p. 16).  Hacienda presented credible evidence showing that it was common practice in the industry for copyright owners to notify distributors and recording studios when a song's copyright was transferred.  (Hacienda Ex. 11).

### F.  Hacienda's Use of *Somos Dos Gatos*

Hacienda signed an artist-development agreement with the band *El Conjunto Inizzio* in 2008. (Hacienda Ex. 38).  Hacienda recorded and released *El Conjunto Inizzio*'s album, *Y Como le Hare*, the same year.  (Hacienda Ex. 43).  The band selected the songs to record for the album.  They told Rick Garcia that they wanted to record a song called *Popurri: El Viento/Dos Gatos*.  The song was a medley and included music and lyrics substantially similar to parts of *Somos Dos Gatos*. (Showalter Testimony, Oct. 21 Tr., Vol. 3, pp. 96–97).

Garcia researched *Somos Dos Gatos* on BMI's website and learned that Musica Adelena owned the song's copyright and that Martinez and Quirino had composed it.  (Garcia Testimony, Oct. 22 Tr., Vol. 2, pp. 87–88; Hacienda Ex. 1).  BMI did not list contact information for Musica Adelena, (Hacienda Ex. 3), and Garcia did not communicate with Harry Fox or BMI to obtain contact information for the company.  (Garcia Testimony, Oct. 22 Tr., Vol. 2, pp. 33–34).  Hacienda did not try to get a license to use *Somos Dos Gatos* before recording and distributing the album containing parts of the song.

In 2008, Hacienda released the album *Y Como le Hare*, containing parts of *Somos Dos Gatos*. (Tempest Ex. 27).  Hacienda credited Musica Adelena, Martinez, and Quirino on the CD jacket for the album.  (Hacienda Ex. 43 at 2).  Only 48 CDs of *Y Como le Hare* were sold.  (Hacienda Exs. 9, 36).  Hacienda's net revenue for *Y Como le Hare* sales was $74.90.  (Hacienda Exs. 8, 9, 10, 36).

Rick Garcia testified that he believed that Max Silva was the "face" of Musica Adelena. (Garcia Testimony, Oct. 22 Tr., Vol. 2, p. 30).  Others in the industry shared this belief.  Bonifacio Mauricio, a Tejano artist who had worked with Musica Adelena, also testified that he believed Silva ran Musica Adelena.  (Mauricio Testimony, Oct. 22 Tr., Vol. 1, p. 13).  Garcia testified that Silva

was his friend and that he had intended to ask Silva for a license to use *Somos Dos Gatos* when they next saw each other.  (Garcia Testimony, Oct. 22 Tr., Vol. 2, pp. 88–89).  But Garcia had not seen Silva since 2001 and did not see Silva between 2008, when Hacienda released the album containing part of the song, and 2012, when this suit was filed.  Between 2008 and 2012, Hacienda did not contact Silva or try to get a license to use *Somos Dos Gatos* from Musica Adelena or from Harry Fox.

Rick Garcia's testimony about his intent to eventually get a license to use *Somos Dos Gatos* from Musica Adelena does not mesh with the fact that Silva ran Discos MM and was not employed by Musica Adelena or authorized to grant licenses on its behalf.  Even if Garcia's belief that Silva could grant licenses on Musica Adelena's behalf was reasonable, Garcia made no effort to get a license from Silva.  Garcia had not seen or spoken to Silva since 2001, 7 years before *Y Como le Hare* was released and 11 years before this suit was filed.  (*Id.* at pp. 119–20).  It was not reasonable for Garcia to wait until he saw Silva before making any effort to get a license to use the song.

### G.    Counsel for Tempest Contacts Hacienda

On April 5, 2011, David Showalter, Tempest's attorney, sent Hacienda a letter claiming that Musica Adelena owned the copyrights to the songs *Buscando un Cariño*, *Morenita de Ojos Negros*, and *Joe's Special*.  (Hacienda Ex. 6).  Showalter told Hacienda that its use of these songs infringed Musica Adelena's copyrights, and demanded that Hacienda stop using the songs and account for its profits from the songs and from any licenses it had received or issued for them.  (*Id.*).  In an April 8, 2011 response, Hacienda admitted that Musica Adelena owned the copyrights for *Buscando un Cariño* and *Morenita de Ojos Negros* and asked for a compulsory mechanical license for those songs.  (Hacienda Ex. 7).  Hacienda disputed that Musica Adelena owned the copyright to *Joe's Special* and asked Showalter to send proof of copyright ownership.  (*Id.*).

11

Tempest did not respond to Hacienda's April 8, 2011 letter. Nor did Tempest send Hacienda a demand letter about its use of *Somos Dos Gatos*. Instead, in March 2012, Tempest sued Hacienda alleging its infringement of four songs, including *Somos Dos Gatos*, as well as *Morenita de Ojos Negros* and *Buscando un Cariño*. (Docket Entry No. 1). Hacienda stopped selling and promoting the *Y Como le Hare* album containing part of *Somos Dos Gatos* when Tempest filed this suit.

In October 2012, Tempest told Harry Fox to stop issuing licences for any of Tempest's songs without its prior written permission and to cancel all the licenses the Harry Fox Agency had previously issued to Hacienda. (Hacienda Exs. 24, 25).

### H.    Industry Practice

The parties presented evidence on the practice of granting licenses in the Tejano music industry. Sharkey credibly testified that any recording company could have obtained a license to record and release the song *Somos Dos Gatos* by either contacting the Harry Fox Agency or Musica Adelena. (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 61–63). Sharkey's testimony was consistent with Rick Garcia's, who stated that he believed Musica Adelena would have granted a license for Hacienda to use *Somos Dos Gatos* because it was routine to grant licenses on request. (Garcia Testimony, Oct. 22 Tr., Vol. 2, p. 30).

Garcia testified that it was common practice in the industry to release an album first and then get a license to use the songs on the album later. (*Id.* at pp. 95, 110). His testimony in this regard was credible in part. While Hacienda presented evidence that Musica Adelena often granted a license after an album's release, (*see* Hacienda Ex. 26), the evidence showed that licenses were typically requested before release. A licence that did not issue until after an album's release was typically due either to "lag time" while the license was finalized or to short delays in requesting the license. (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 72–74). Sharkey credibly testified that from

12

1992 to 2000, no recording company contacted Musica Adelena to obtain a retroactive license for a work that had been recorded and released on an album years earlier, and that it was not industry practice to do so.  (*Id.* at pp. 72–74).

The court finds that Hacienda did not act in accordance with industry practice when it released *Y Como le Hare* without requesting a license to use *Somos Dos Gatos*.  The court also finds that Hacienda's decision to sell the album *Y Como le Hare* for four years without requesting any license was not consistent with industry practice.

## I.  The Parties' Conduct

The court finds that by releasing the *Y Como le Hare* album without first obtaining a license to use *Somos Dos Gatos*, Hacienda infringed Musica Adelena's copyright for the song.  The evidence showed that the members of *El Conjunto Inizzio* told Rick Garcia that someone else had written the song.  Garcia researched the BMI website and learned the names of the composers and that Musica Adelena was the copyright owner.  Garcia's testimony that he intended eventually to ask Silva for a license shows that he knew the song was copyrighted and that he needed a license to record and distribute copies of it.  The court finds that Hacienda knew or should have known that it infringed the copyright for *Somos Dos Gatos*.

Despite knowing that Musica Adelena owned the copyright to the song Hacienda had recorded and distributed, Garcia did not contact Musica Adelena, Harry Fox, or Max Silva to request a license.  After Showalter's April 2011 demand letter claiming that Hacienda infringed other Musica Adelena-copyrighted works, Hacienda had information about how to contact Musica Adelena's attorney.  In April 2011, Garcia knew that Musica Adelena owned the *Somos Dos Gatos* copyright.  Garcia had Musica Adelena's contact information but still did not request a license.  Hacienda sold the *Y Como le Hare* album for four years without asking for a license to use *Somos*

13

*Dos Gatos* on that album. The court finds that Hacienda acted in reckless disregard of Musica Adelena's copyright and that, given Hacienda's experience in the music-recording industry and its knowledge that Musica Adelena owned the copyright for the song, its infringement was not innocent.

## III.   Conclusions of Law

### A.   Tempest Owned a Valid Copyright

"[T]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she was the owner of it." 17 U.S.C. § 501(b). Proving copyright infringement requires proof of (1) ownership of a valid copyright and (2) actionable copying by the defendant. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012); *Positive Black Talk Inc v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 599 U.S. 154 (2010).

To establish ownership, the plaintiff must show that the material is original and can be copyrighted and that all statutory formalities are met. "To maintain a copyright infringement claim, the owner of the copyright must have registered it." *Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.*, 226 F.3d 387, 392 (5th Cir. 2000) (citing 17 U.S.C. § 411(a)). "In judicial proceedings, a certificate of copyright registration constitutes *prima facie* evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid." *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir. 1990).

Tempest produced a certificate of copyright registration showing that Tessitura had registered *Somos Dos Gatos*. (Tempest Exs. 3, 4). The burden shifted to Hacienda to demonstrate why the copyright was invalid. Hacienda argues that the Songwriters Contract was not valid and

did not transfer Martinez's and Quirino's interest in *Somos Dos Gatos* to Tessitura, which made the copyright registration invalid.

The Songwriters Contract stated that Martinez and Quirino transferred to Tessitura Music Trust "certain heretofore unpublished original musical works, as annexed hereto, written and/or composed by the Writer, now entitled, 'DOS GATOS.'" (Tempest Ex. 10; Hacienda Ex. 22). Hacienda argues that because there is no annex to the contract, no rights were assigned and there was no meeting of the minds. The Songwriters Contract does not fail on this basis. Although there is no annex, the contract explicitly states that the rights to the song *Dos Gatos* are transferred. There is no evidence that "DOS GATOS" could have referred to any song other than *Somos Dos Gatos*.

Hacienda also argues that the Songwriters Contract is not valid because it was modified without Martinez's and Quirino's consent. Sharkey put handwritten notes on Musica Adelena's copies of the signed Songwriters Contracts between 1993 and 1998, adding the word "SOMOS" in front of "DOS GATOS" on one contract, and replacing "Tessitura Music Trust" with "Musica Adelena" on both contracts. (Tempest Ex. 10; Hacienda Ex. 22). Sharkey credibly testified that he made these changes as notes to himself to reflect the song's new title, *Somos Dos Gatos*, and the transfer of copyright ownership from Tessitura to Musica Adelena in 1993. (Sharkey Testimony, Oct. 21 Tr., Vol. 2, pp. 53, 55).

Under Texas law, the typed parts of a contract are given more weight than its handwritten parts. *Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 578 (Tex. 1964). Although handwritten changes can modify the terms of a printed contract, both parties must agree to them. *See Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 210 (5th Cir. 1998). There is no evidence that Martinez and Quirino agreed to Sharkey's handwritten changes. (Sharkey Testimony, Oct. 21 Tr., Vol. 3, pp. 12–13, 15, 21). The fact that Sharkey wrote on his copy of the Songwriters

15

Contract after the fact without telling Martinez and Quirino does not void the Songwriters Contract. It simply means that Sharkey's modifications were not incorporated.

The Songwriters Contract is valid without the modifications. It is clear that "DOS GATOS" refers to the song better known as *Somos Dos Gatos* but originally registered with the Copyright Office as *Dos Gatos*. Because the contract did not require Tessitura to get permission from Martinez or Quirino to assign Tessitura's rights under the contract, the assignment from Tessitura to Musica Adelena in 1993 was also valid.

The court has found, and now concludes, that Martinez and Quirino assigned their rights to the song *Somos Dos Gatos* to Tessitura under the Songwriters Contract. The trial evidence shows, and the parties do not dispute, that the song was original, that it could be copyrighted, and that Tessitura complied with the statutory formalities for copyrighting it. *See Lakedreams v. Taylor*, 932 F.2d 1103, 1107–08 (5th Cir. 1991) (stating that to show ownership, the plaintiff must prove that the material is original, that it can be copyrighted, and that he or she has complied with statutory formalities).

The court concludes that Tessitura assigned its interest in the Songwriters Contract and the *Somos Dos Gatos* copyright to Musica Adelena in January 1993. (Tempest Ex. 13; Hacienda Ex. 33). Sharkey acquired Musica Adelena, its contracts, and its copyrights in July 1998. Tempest purchased Musica Adelena, its contracts, and its copyrights from Sharkey in March 2000. (Tempest Ex. 12). The court concludes that Tempest owned the copyright to *Somos Dos Gatos* during the relevant time.

### B.    Hacienda Infringed Tempest's Copyright to *Somos Dos Gatos*

Copying is shown by proving "(1) factual copying and (2) substantial similarity." *Positive Black Talk Inc v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other*

*grounds by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010) (citing *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003)).  A plaintiff can show factual copying through either direct or circumstantial evidence, such as proof that the defendant had access to the copyrighted work or substantial similarity.  *Positive Black Talk*, 394 F.3d at 368 (quoting *Peel & Co. v. Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001)).

"'A copyright owner may grant a license in his work, thereby waiving his right to sue the licensee for copyright infringement.'"  *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 771 (N.D. Tex. 2006) (quoting *Pavlica v. Behr*, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005)).  "[T]he existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement."  *Carson*, 344 F.3d at 451 n. 5.

The credible trial evidence showed that Hacienda copied *Somos Dos Gatos* without a license to do so.  The court has found, and now concludes, that there is substantial similarity between the copyrighted song and the song Hacienda recorded and distributed.  The song Hacienda recorded and distributed on the album *Y Como le Hare*, *Popurri: Viejo el Viento/Dos Gatos*, contains music and lyrics that are substantially similar to the music and lyrics of the copyrighted song, *Somos Dos Gatos*.  (Showalter Testimony, Oct. 21, Vol. 3, pp. 96–97).

### C.      Hacienda's Infringement Was Not Innocent

A copyright owner may request either actual or statutory damages.  17 U.S.C. § 504.  Tempest has elected statutory damages.  Statutory damages are reduced if the defendant proves that the infringement was innocent, that is, the defendant "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright."  *Id.*

Hacienda was on notice, based on the information it learned from the BMI website, that Musica Adelena owned the copyright for *Somos Dos Gatos*.  Hacienda's inclusion of the composers

17

and publisher of *Somos Dos Gatos* on the CD cover for the *Y Como le Hare* album shows Hacienda's knowledge that the work was copyrighted.  Hacienda also knew that it had no license. *See Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986) (affirming a willfulness finding based on the defendants' internal documents indicating its knowledge of rights in the infringed work).

Hacienda claims that its conduct was innocent because it relied on an industry practice of requesting a license after an album was released, even after an extensive period.  The court has found that such a practice of after-the-fact license requests applied to requests made after only short delays.  The evidence showed no industry practice of not requesting a license until four years after recording and distributing a copyrighted song.  Even if a practice of violating copyright laws by not promptly requesting licenses existed in the Tejano music industry, as Hacienda claims, it would not explain or excuse the extensive delay here.

### D.      Hacienda's Infringement Was Willful

To show that Hacienda's infringement was willful, Tempest must prove by a preponderance of the evidence that Hacienda knew or should have known that it infringed a copyrighted work, or that it recklessly disregarded Tempest's and Musica Adelena's rights.  *See Graper v. Mid-Continent Cas. Co.*, 756 F.3d 388, 395 (5th Cir. 2014) (holding that "willfully" encompasses reckless disregard of the copyright owner's rights); *see also N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992).

The court has found, and now concludes, that Hacienda knew or should have known that it infringed the copyrighted work *Somos Dos Gatos* and that Hacienda recklessly disregarded Tempest's rights in the song.  Hacienda was experienced in the music industry and in the law prohibiting use of copyrighted songs without permission.  *See Lance v. Freddie Records, Inc.*, No.

18

92-7561, 986 F.2d 1419, at *2 (5th Cir. 1993) (unpublished) (affirming a willful-infringement finding because the defendant had 20 years of experience in the music industry and "was quite familiar with the applicable copyright laws."); *Twin Peaks Prods., Inc. v. Publications Intern., Ltd.*, 996 F.2d 1356, 1382 (2d Cir. 1993) (finding that a publisher willfully infringed and rejecting the argument that the publisher did not realize the work was copyrighted given its industry experience).

Hacienda cites *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 957 (9th Cir. 2001), in which the court found that the challenged conduct was not willful because the defendant did not have notice of any copyright claim and did not know that it infringed. *Danjaq* involved the production of James Bond movies. The defendant had hired a screenwriter to create scripts based on the novels and had released several popular James Bond films. Years earlier, the plaintiff had written scripts for James Bond movies. The plaintiff alleged that the scripts the defendant used copied elements of the scripts he had written. The Ninth Circuit found that the defendant's copyright infringement was not willful, noting that the defendant had proper title to the screenplays he used in his films and the plaintiff had not provided any notice of a copyright in the screenplays during the first decade the defendant released James Bond films. *Id.* at 959 (citing *Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 515 (9th Cir. 1985) (finding that the infringement was not willful because the defendants reasonably could have believed that they had a valid license to use the work)). The court also noted that the plaintiff and the defendant had negotiated a 10-year license that allowed the defendant to release another James Bond movie, and the plaintiff had not indicated during those negotiations that any other James Bond films might infringe his copyrights. *Id.* at 958.

Unlike the defendant in *Danjaq*, Hacienda knew when it recorded and distributed the album containing parts of *Somos Dos Gatos* that Musica Adelena claimed rights in the song and that Hacienda had no license to use it. Although Hacienda did not know then that Tempest had

purchased Musica Adelena, Hacienda knew that it needed to contact Musica Adelena or Harry Fox to obtain a license before releasing the song.  Hacienda did not do so.  The court finds and concludes that Hacienda willfully infringed Tempest's copyright to *Somos Dos Gatos*.

### E.    Damages

"Statutory damages under the Copyright Act are designed not only to provide 'reparation for injury,' but also 'to discourage wrongful conduct.'" *Sony BMC Music Entertainment v. Tenenbaum*, 719 F.3d 67, 71 (1st Cir. 2013) (quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 223 (1952)); *see also Lance*, 986 F.2d 1419, *2 ("One of the goals in imposing statutory damages on a copyright infringer is to deter future violations of the copyright laws, with an eye to proving that it 'costs less to obey the copyright laws than to violate them.'" (quoting *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1020–21 (7th Cir.), *cert denied*, 112 S. Ct. 181 (1991))). Among the factors courts consider in setting damages amounts are whether the defendant's conduct was innocent or willful, the profits the defendant earned, the revenues the plaintiff lost, whether the defendant has cooperated in providing necessary information, and the potential for discouraging future copyright infringement by the defendant and others.  *See Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986).

The court has found and concluded that Hacienda's conduct was willful and not innocent. But the evidence shows that Tempest suffered damages of no more than $4.37, the amount of mechanical royalties it would have received from sales of 48 *Y Como le Hare* albums.  Hacienda's net revenue from those sales was only $79.40.  (Hacienda Exs. 8, 9, 10, 36).  The evidence also showed that Hacienda stopped selling *Y Como le Hare* as soon as it received notice of Tempest's suit.  *Cf. Bryant v. Europadisk, Ltd.*, No. 07-CIV-3050(WGY), 2009 WL 1059777 (S.D.N.Y. Apr.

20

15, 2009) (noting that although the defendant did not act innocently, it "immediately ceased its infringing conduct when made aware of [the plaintiff]'s copyright claim.").

The court concludes that an appropriate amount of damages is $5,000. The revenues the defendants received, $79.40, are minor. The revenues Tempest lost are minuscule. The amount addresses Hacienda's fault, the lack of financial consequences, Hacienda's cooperation, and the goal of deterrence.

### F.    Attorneys' Fees

Section 505 of the Copyright Act provides that:

> In any civil action under this title, the court in its discretion may
> allow the recovery of full costs by or against any party other than the
> United States or an officer thereof. Except as otherwise provided by
> this title, the court may also award a reasonable attorney's fee to the
> prevailing party as part of the costs.

17 U.S.C. § 505.

The Supreme Court considered the standards for attorneys' fee awards under the Copyright Act in *Fogerty v. Fantasy, Inc*., 510 U.S. 517, 521 (1994). The Court rejected the "dual" standard under which "prevailing plaintiffs are generally awarded attorney's fees as a matter of course, while prevailing defendants must show that the original suit was frivolous or brought in bad faith." *Id.* at 520–21. "Because copyright law ultimately serves the purpose of enriching the general public through access to creative works . . . a defendant seeking to advance meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Id*. at 517–18. The Court clarified that it was not adopting the "British Rule" of awarding "attorney's fees as a matter of course." *Id.* at 533. Instead, "attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion." *Id.* at 534.

21

The recovery of attorneys' fees is not automatic.  *Virgin Records Am., Inc. v. Thompson*, 512 F.3d 724, 726 (5th Cir. 2008).  In determining whether a fee award is appropriate, a court may consider the following nonexclusive factors: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.*, 512 F.3d at 726 (quoting *Fogerty*, 510 U.S. at 534 n. 19).

### 1.    Who is the Prevailing Party?

A prevailing party is one who has "prevailed on the merits of at least some of his claims." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) (quotation marks omitted).  A party prevails only if it obtains a "judicially sanctioned change in the legal relationship of the parties."  *Id.* at 605.  "No material alteration of the legal relationship between the parties occurs until [one of the parties] becomes entitled to enforce a judgment, consent decree, or settlement against the [other]."  *Farrar v. Hobby*, 506 U.S. 103, 113 (1992).[2]  Prevailing party status is determined without regard to "the amount of damages awarded."  *Buckhannon*, 532 U.S. at 603.

Courts have taken different approaches in applying these principles in copyright cases involving "mixed judgments," in which a party succeeds on some claims and counterclaims but not on others.  Some courts have found a plaintiff to be the only prevailing party if it succeeds on at least

---

[2]  Although the Fifth Circuit has not addressed who is a prevailing party under § 505, the circuit courts addressing this issue apply the *Buckhannon* material-alteration test.  *See, e.g.*, *Balsley v. LFP, Inc.*, 691 F.3d 747, 772 (6th Cir. 2012) (applying *Buckhannon* to the Copyright Act); *Cadkin v. Loose*, 569 F.3d 1142, 1145 (9th Cir. 2009) ("*Buckhannon*'s material alteration test applies to § 505 of the Copyright Act."); *Riviera Distribs., Inc. v. Jones*, 517 F.3d 926, 928 (7th Cir. 2008) (holding that a voluntary dismissal with prejudice of copyright claims confers prevailing party status on defendants under *Buckhannon*); *Torres-Negron v. J & N Records, LLC*, 504 F.3d 151, 164 & n. 9 (1st Cir. 2007) (holding that *Buckhannon*'s material alteration test applies to copyright claims and concluding that a dismissal for lack of subject matter jurisdiction did not confer prevailing party status).

one copyright claim.  *See Jacobs v. Memphis Convention & Visitors Bureau*, No. 2:09-cv-2599-STA-cgc, 2012 WL 4468500 (W.D. Tenn. Sept. 7, 2012), *report and recommendation adopted*, 2012 WL 4461275, at \*3 (W.D. Tenn. Sept. 25, 2012) (the defendant had infringed the copyright in four of nine photographs, willfully infringing two; the court concluded that the plaintiff had obtained "a significant amount of relief" and "achieved a substantial benefit" that was "neither purely technical nor de minimis."); *Boisson v. Banian Ltd.*, 280 F. Supp. 2d 10, 20 (E.D.N.Y. 2003) (the plaintiff succeeded on only one of several copyright infringement claims; and the court held that "[i]t is clear . . . that [the plaintiff] succeeded on a significant aspect of her initial lawsuit, and thus it is appropriate to declare [the p]laintiff as the prevailing party within the meaning of the Copyright Act.").

        Other courts have found that neither party prevailed when a plaintiff asserted a large number of copyright claims and obtained a liability finding and limited damages on only a few.  *See Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1022 (7th Cir. 1991), *abrogated on other grounds*, *Fogerty*, 510 U.S. 517 (affirming a district court's finding that "neither [the plaintiff] who prevailed on but two of its seven infringement claims, nor [the defendant], who wound up on the wrong end of a $10,000 judgment, can be deemed the 'prevailing' party."); *ARP Films, Inc. v. Marvel Entm't Grp., Inc*., 952 F.2d 643, 651 (2d Cir. 1991) (holding that "[i]n view of the mixed outcome of this litigation, the district court was well within its discretion in concluding that plaintiffs were not prevailing parties within the meaning of [§] 505.").  This approach appears inconsistent with *Farrar*, in which the Supreme Court held that "the amount of damages awarded" is generally irrelevant to deciding whether a party has prevailed and that prevailing-party status only requires success "on the merits of at least some of his claims."  *Buckhannon*, 532 U.S. at 603 (quotation omitted).  In *Video Views* and *ARP Films*, the parties seeking attorneys' fees had obtained a favorable judgment on

23

liability and were awarded more-than-nominal damages.  This was sufficient to show a "judicially sanctioned change in the legal relationship of the parties."  *Id.* at 605.

Other courts have taken still another approach, considering all the claims alleged to determine the "overall prevailing party."  *See Brighton Collectibles, Inc. v. Coldwater Creek Inc.*, No. 06-cv-1848-H(POR), 2009 WL 160235, at *3 (S.D. Cal. Jan. 20, 2009) (after summary judgment dismissing one of the plaintiff's copyright claims, and a jury finding that the defendant was liable for willfully infringing the other copyright, the court found that the plaintiff was the only prevailing party because it "succeeded on its claim for willful infringement of [one of its copyrights] and was awarded significant damages," explaining that "the dismissal of one of its copyright claims does not prevent it from being deemed the overall prevailing party under the Copyright Act."); *Florentine Art Studio, Inc. v. Vedet K. Corp.*, 891 F. Supp. 532, 541 (C.D. Cal. 1995) (two of the defendants were prevailing parties because they "prevailed on seven of the nine infringement counts, were found merely to be innocent infringers on the remaining two, and were assessed the minimum statutory damages.").[3]  This approach appears inconsistent with the Supreme Court holdings that "'the degree of [a party's] success does not affect eligibility for a fee award.'"  *Balsley v. LFP, Inc.*, 691 F.3d 747, 772 (6th Cir. 2012) (quoting *Farrar*, 506 U.S. at 114); *see also Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989) (holding in the § 1988 context that "the search for the 'central' and 'tangential' issues in the lawsuit, or for the 'primary,' as opposed to the

---

[3]  Other courts have sidestepped the prevailing-party issue.  In *Granville v. Suckafree Records, Inc.*, No. Civ. A. H-03-3002, 2006 WL 2520909 (S.D. Tex. June 28, 2006), the plaintiff was successful on only one of several copyright infringement claims.  The plaintiff sought attorneys' fees under § 505, but the defendants did not.  The court first noted that "[i]n one sense . . . both [the p]laintiff and [d]efendants 'prevailed' on the copyright claims or, looking at it from the backside, neither [the p]laintiff nor [the d]efendants can be regarded as the prevailing party."  *Id.* at *2.  The court did not resolve whether the plaintiff was a prevailing party but considered the plaintiff's overall lack of success as one of several reasons to deny fees to both sides.

'secondary,' relief sought, much like the search for the golden fleece, distracts the district court from the primary purposes behind § 1988 and is essentially unhelpful in defining the term 'prevailing party.'").

The approach that considers which party prevailed on each asserted copyright claim appears consistent with Supreme Court and Fifth Circuit precedent.  This was the approach adopted by the Sixth Circuit in *Balsley*, 691 F.3d 747.  That court rejected the position that the defendant was entitled to fees because it was the "overall prevailing party," or that it should receive "four sevenths (57.1%)" of the fees it requested because it successfully defended against four of the plaintiff's seven claims.  *Id.* at 772.  Instead, the court considered "each prevailing party's entitlement to fees under the claims they prevailed upon."  *Id.*

Tempest and Hacienda prevailed on different claims.  Tempest sued Hacienda and its related entities for infringing the copyright in four songs.  Although the court found that Hacienda willfully infringed Tempest's rights in one of the songs, the court also found that Hacienda had not infringed the copyright in the other three songs.  In *Warner Bros., Inc. v. Dae Rim Trading, Inc.*, 677 F. Supp. 740 (S.D.N.Y. 1988), *aff'd in part and rev'd in part* 877 F.2d 1120 (2d Cir. 1989), the court considered a similar mixed recovery.  The plaintiff alleged that two copyrights were infringed.  The defendant counterclaimed for a declaratory judgment that the plaintiff's copyrights were invalid or not infringed and that a TRO was illegal and abusive.  Early in the case, the defendants conceded infringement of one of the copyrights at issue and consented to an injunction.  The plaintiff voluntarily dismissed its claim for infringement of the other copyright.  The court held a bench trial on the amount of statutory damages for the remaining infringement claim, whether the infringement was willful, and who should receive attorneys' fees and costs.

In *Warner Bros.*, the court found that the infringement of the remaining copyright was innocent and not willful, and, after concluding that the plaintiff had not proven actual damages, entered the $100 minimum statutory award. The court awarded attorneys' fees to the defendant and not to the plaintiff because "[l]ong before there was any trial, the 'main issue' had ceased to be any issue of the validity of Warner's copyrights, or of their infringement." *Id.* at 771. Because the defendant had prevailed on all the remaining issues, "[t]o conclude that [the plaintiff] was 'the prevailing party' only because it will secure a permanent injunction *on consent* as to *one* copyright and will secure minimum statutory damages of $100, would be 'too wooden a view' . . . ." *Id.* (quoting *Sci. Holding Co. v. Plessey Inc.*, 510 F.2d 15, 28 (2d Cir. 1974) (emphasis in original)).

The *Warner Bros.* court rejected the argument that both the plaintiff and defendant were prevailing parties under the Copyright Act because the plaintiff succeeded on one infringement claim and the defendant obtained a court order dismissing the other. The court held that "there is only one 'prevailing party' on any one claim for relief in an action" and that "[t]here was only one claim for relief in the complaint . . . when [it] was filed and the complaint contained only one count." *Id.* at 772. The court awarded the defendant the attorneys' fees and costs it incurred after it had conceded infringement. *Id.* at 773. On appeal, the Second Circuit reversed the attorneys' fees award to the defendant because, "[v]iewed in the light of the litigation as a whole, neither [party's] success was sufficiently significant to mandate an award of attorneys' fees." *Dae Rim*, 877 F.2d at 1126 (internal citation omitted). The court explained:

> although [the plaintiff] obtained a permanent injunction against future infringement of the "Gizmo" copyright, the [defendants] had offered to consent to the entry of a permanent injunction long before the trial began. Finally, [the plaintiff's] efforts to prove that the [defendants] were willful infringers so as to justify a substantial award of statutory damages were unsuccessful. Defendants' affirmative efforts did not fare much better. They counterclaimed, asserting that [the plaintiff's]

26

> copyrights were invalid, but, after conducting discovery, they withdrew that claim. They also sought damages for the alleged unlawful issuance of the temporary restraining order, but no award was made.

*Id.* at 1126–27.  The court concluded that "balancing . . . all the factors, with due regard to the heavier burden imposed upon defendants who seek fees, leads us to conclude that neither side should be awarded attorneys' fees."  *Id.* at 1127 (internal citation omitted).

The evidence in this record is analyzed under the applicable statutory and case law.

### 2.    The Frivolousness and Objective Unreasonableness Factor

The first factor considered in deciding whether to award attorneys' fees is the frivolousness or objective unreasonableness of the claims and defenses.   "'Objective unreasonableness' is generally used to describe claims that have no legal or factual support." *Viva Video, Inc. v. Cabrera*, 9 Fed. App'x. 77, 80 (2d Cir. 2001).  "[T]he imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." *Matthew Bender & Co. v. West Pub. Co.*, 240 F.3d 116, 122 (2d Cir. 2001).  There is a difference between a suit that is "without merit" and one that is "patently frivolous." *See Positive Black Talk*, 394 F.3d at 382 n. 23.

The role of this factor is illustrated in *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814 (5th Cir. 1997).  The Fifth Circuit upheld the district court's refusal to award the defendant attorneys' fees despite a summary judgment ruling that the works were not substantially similar.  *Id.* at 816. The district court concluded that the infringement claim, "though ultimately not successful, was neither frivolous nor objectively unreasonable, either in its factual allegations or its legal undergirding." *Creations Unlimited, Inc. v. McCain*, 889 F. Supp. 952, 954 (S.D. Miss. 1995).  On the other hand, in *Coles v. Wonder*, 283 F.3d 798 (6th Cir. 2002), the Sixth Circuit upheld the

district court's award of attorneys' fees to the defendant, affirming the conclusion that the plaintiffs' claims were objectively unreasonable because the legal issues were clear and no case law from any circuit supported the plaintiffs' position.  *Id.* at 803.

Although Tempest did not prevail on its claims as to three of the songs, its claims against Hacienda were neither frivolous nor objectively unreasonable.  Tempest believed, based on its Songwriters Contracts with the songs' composers, that it owned the copyright to each song. Tempest registered the copyrights and paid the composers royalties, and Hacienda obtained no licenses to use the songs.

Hacienda prevailed on the claims that it did not infringe these three songs.  Tempest prevailed on its claim that Hacienda infringed the copyright in *Somos Dos Gatos* and obtained a court ruling that the infringement was not innocent and was willful.  The evidence, however, also showed mitigating factors, including Tempest's failure to notify Hacienda and other distributors that it had purchased Musica Adelena, confusion over who ran Musica Adelena, the industry practice of granting a retroactive license when the delay in requesting a license was short, Hacienda's payments, and Hacienda's action in stopping the distribution of the album as soon as Tempest asserted its claim and in paying a mechanical license royalty.  The evidence leads the court to conclude that the objective unreasonableness factor weighs against granting attorneys' fees to either Hacienda or Tempest.

### 3.     The Motivation Factor

The second factor in deciding whether to award fees is the parties' motivation.  In evaluating this factor, other circuits have considered: (1) the defendant's status as an innocent, rather than a willful or knowing, infringer; (2) the plaintiff's prosecution of the case in bad faith; and (3) the defendant's good-faith attempt to avoid infringement.  *Brooktree Corp. v. Advanced Micro Devices,*

28

*Inc.*, 977 F.2d 1555, 1583 (Fed. Cir. 1992) (citing *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 323 (9th Cir. 1987)).

The absence of improper motives weighs against awarding attorneys' fees to any of the parties in this case.  Although Hacienda was a willful infringer as to *Somos Dos Gatos*, the evidence showed that Hacienda did not infringe the copyright in the other three songs.  Hacienda acted in good faith throughout the litigation, stopping the production and distribution of the album containing the songs Tempest claimed were infringing as soon as Tempest filed suit.  Hacienda also offered to pay Tempest royalties for *Buscando un Cariño* and *Morenita de Ojos Negros* when it received Showalter's demand letter.  (Hacienda Ex. 7).  Tempest did not send a demand letter for the two other songs at issue in this suit.  The evidence showed confusion about who ran Musica Adelena and how it could be contacted when Hacienda recorded *Y Como le Hare*.  Despite the finding of willful infringement, Hacienda did not display improper motivations in its approach to the royalty demands.

Nor has Hacienda shown that Tempest sued in bad faith.  "[P]rotection of one's copyright constitutes a permissible motivation in filing a copyright infringement case against one whom the copyright holder believes in good faith to have infringed the copyright."  *Luken v. Int'l Yacht Council, Ltd.*, 581 F. Supp. 2d 1226, 1245 (S.D. Fla. 2008).

This factor weighs against awarding fees to either party.

### 4.    Compensation and Deterrence

The third factor in deciding whether to award fees is the need for compensation and deterrence.  "[U]nlike civil rights suits, where while a prevailing plaintiff is presumptively entitled to an award of fees, a prevailing defendant is entitled to such an award only if the suit was groundless . . . in copyright suits 'prevailing plaintiffs and prevailing defendants are to be treated alike.'"  *Assessment Tech. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 436 (4th Cir. 2004).

(quoting *Fogerty*, 510 U.S. at 534) (internal citations omitted).  "If the case was a toss-up and the prevailing party obtained generous damages, or injunctive relief of substantial monetary value, there is no urgent need to add an award of attorneys' fees.  But if at the other extreme the claim or defense was frivolous and the prevailing party obtained no relief at all, the case for awarding him attorneys' fees is compelling."  *Id.* at 436–37 (citations omitted); *see also Quinto v. Legal Times of Wash., Inc.*, 511 F. Supp. 579, 581 (D.D.C. 1981) (compensation "helps to ensure that all litigants have equal access to the courts to vindicate their statutory rights.  It also prevents copyright infringements from going unchallenged where the commercial value of the infringed work is small and there is no economic incentive to challenge an infringement through expensive litigation.").

This factor also weighs against awarding attorneys' fees to either party.  Both parties acted in good faith in asserting and defending their positions in this case.  The $5,000 damages award against Hacienda, despite anemic sales, paltry revenues, and minuscule royalties, is sufficiently large to have a deterrent effect.  No additional award is needed to achieve deterrence or compensation.

### 5.    Balancing the Factors

The balance of factors amply supports denying attorneys' fees to both Tempest and Hacienda.

## V.   Conclusion

The court finds and concludes that:

- Hacienda infringed Tempest's copyright for the song *Somos Dos Gatos*;

- the infringement was not innocent;

- the infringement was willful;

- Hacienda must pay Tempest $5,000 as damages; and

- no party recovers its attorneys' fees.

30

An order of final judgment will issue separately.

SIGNED on March 18, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge